IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

ERIC F. HADDIX,

      Plaintiff,

*vs.*
                                 **Civil Action No. 5:06CV92**
                                 **(Judge Frederick P. Stamp, Jr.)**

MICHAEL J. ASTRUE,[1]
COMMISSIONER OF
SOCIAL SECURITY,

      Defendant.

## REPORT AND RECOMMENDATION/OPINION

Eric F. Haddix brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain

judicial review of a final decision of the Commissioner of Social Security ("Defendant," and

sometimes "Commissioner") denying his claims for Supplemental Security Income ("SSI") and

Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security

Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on Plaintiff's

Motion for Summary Judgment and Motion for Remand Pursuant to the Sixth Sentence of 42 U.S.C.

§ 405(g) and Defendant's Motion for Summary Judgment and has been referred to the undersigned

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be substituted, therefore, for former Commissioner Jo Anne B. Barnhart (or Acting Commissioner Linda L. McMahon [if the caption was changed previously]) as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. §405(g).

United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

## I. Procedural History

Eric Haddix ("Plaintiff") filed an application for SSI and DIB on June 29, 2004, alleging disability since November 30, 2003, due to osteoarthritis in both knees (R. 103, 115, 265). Plaintiff's applications were denied initially and on reconsideration (R. 83, 90, 271, 277). Plaintiff requested a hearing, which Administrative Law Judge ("ALJ") Randall Moon held on January 10, 2006 (R. 22). Plaintiff, represented by a non-attorney benefits representative, testified along with witness Jamie Pullen and John Panza, a vocational expert ("VE"). On February 3, 2006, the ALJ entered a decision finding Plaintiff was not disabled (R. 21). On May 19, 2006, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner (R. 4).

## II. Statement of Facts

Eric F. Haddix ("Plaintiff") was born July 25, 1972, and was 33 years old on the date of the ALJ's decision (R. 28). He graduated from high school and completed a two-year auto mechanics course (R. 34). He has past experience as a telemarketer, in construction, and as a paid picket-line worker.

On February 27, 2004, Plaintiff presented to Doyle Sickles, M.D. (R. 162). He was described as "a laid off telemarketer who stepped off the back of a truck about 3-4 feet, landed on his left leg, then his right." He felt a pop in his left knee. He complained of some swelling which came on gradually. He initially had difficulty putting all his weight on the leg and was using crutches, but was feeling much better by the next day. He denied any locking, just that the knee seemed to want

2

to snap or crunch at times. He denied any giving way. He had swelling of the knee, depending on his level of activity. The pain was sharp if he pivoted or twisted. He could not squat and had difficulty with hills or steps and low chairs.

Dr. Sickles noted that Plaintiff had pain previously in the leg, but was much better now. He was able to bear weight. He was told he had arthritis of the knees and calcium deposits.

On examination, Plaintiff's left knee was slightly enlarged, with no significant increased warmth, erythema, ecchymosis or effusion; no significant tenderness other than slightly about the distal femur; no tenderness about the tibial plateau; no tenderness about the patella; no defect of the quadriceps tendon or patellar tender; and no tenderness posteriorly. His range of motion of the knee was -3 to 120 degrees and he had good strength; no obvious atrophy; no sensory deficits; normal reflexes; and normal arteries. There was no gross instability. McMurray's caused mild clicking and popping but no significant laxity.

Plaintiff's right knee was slightly enlarged but otherwise normal.

X-rays showed osteophyte formation about the knee and mild joint space narrowing medially. One view showed a questionable line, but it did not appear to be a fracture. Dr. Sickles opined that Plaintiff "just ha[d] some degenerative changes of the knee and knee pain," which would be treated conservatively. Plaintiff was to avoid "aggressive activities."

On March 12, 2004, Plaintiff presented to Dr. Sickles for a follow up of his "questionable left knee fracture" (R. 160). Dr. Sickles noted Plaintiff was known to have osteoarthrosis of the knees. He had stepped off a truck three weeks earlier and had knee pain. He was thought to have a fracture, but x-rays did not confirm. X-rays did show significant spurring of the knee and changes consistent with osteoarthrosis, however.

Plaintiff stated he was no better but no worse. The knee bothered him if he bent and squatted or knelt. He had problems walking, with pain, crunching, and snapping. He was able to bear full weight and was not limping.

Upon physical examination, Plaintiff's left knee was slightly enlarged with no significant increased warmth, erythema, ecchymosis or effusion. He had no significant tenderness other than slightly about the distal femur medially; there was no tenderness about the tibial plateau itself; no tenderness about the patella; no defect of the quadriceps tendon or patellar tendon; and no tenderness posteriorly. His range of motion was -3 to 120 degrees. He had good strength and no obvious atrophy. He had no sensory deficits and reflexes were normal. There was no gross instability. McMurray's caused mild clicking and popping but no significant laxity.

X-rays showed continued moderately severe osteoarthrosis of the knee, with no evidence of fracture. The diagnosis was moderate to severe osteoarthrosis of the left knee, status post knee sprain, aggravation of osteoarthrosis. Dr. Sickles found Plaintiff too young to be considered for any type of total knee arthroplasty. He considered injection, but did not think "it's severe enough yet." He gave Plaintiff a sample of Bextra as the Mobic had not helped.

Dr. Sickles wrote a letter to Plaintiff's primary care physician, Michael Hess, M.D., regarding Plaintiff's osteoarthrosis of the knee "that will continue to bother him in the future" (R. 176). Dr. Sickles had determined Plaintiff did not have a fracture. He recommended treatment with non-steroidal anti-inflammatory medications.

Dr. Hess saw Plaintiff on March 16, 2004 (R. 173). Plaintiff stated that his knees were "shot," saying he had had pain in both knees for ten years. Dr. Hess noted Plaintiff's affect was markedly decreased. He diagnosed Plaintiff with arthritis and depression. He prescribed Effexor,

4

Motrin and Lorcet.

On April 6, 2004, Plaintiff complained to Dr. Hess of increased sweats with Effexor, and he could not sleep (R. 172). He also had increasing pain in both knees, somewhat controlled with pain pills. Upon examination, Plaintiff's knees showed crepitus but no swelling. He had "some agitation symptoms on physical examination with regards to his psychiatric well-being." Dr. Hess diagnosed depression and anxiety and arthritis, and gave Plaintiff a trial of Wellbutrin.

On April 16, 2004, Plaintiff told Dr. Hess that he did not tolerate the Wellbutrin (R. 171). He also reported that a neighbor was trying to take away his land. Dr. Hess diagnosed anxiety/depression (situational) and allergies. He prescribed Klonopin and Zyrtec.

On April 20, 2004, Plaintiff underwent an open reduction and internal fixation of the left ankle after he fell (R. 197). He suffered a mildly displaced bimalleolar type fracture.

On July 8, 2004, Plaintiff presented to Dr. Hess with complaints of increasing pain in both knees (R. 165). He was having problems with normal ambulation as well as going up and down stairs. Psychologically, he appeared to be responding well to the Klonopin. Plaintiff's blood pressure was stable; his weight was unchanged at 266 pounds; he was obese. Plaintiff's knees showed severe crepitus bilaterally with questionable McMurray's and negative Lachman's. Psychologically he had a normal affect and thought process. His anxiety and depression were opined to be stable.

On July 21, 2004, Plaintiff presented to Dr. Lefebure reporting doing rather well (R. 200). He had occasional swelling of the ankles and some soreness, but walked without a cane fairly smoothly. He had rather good motion of the ankle. The x-rays showed he was healing rather well. He was otherwise functioning well. He was to continue with careful activities with no vigorous use,

but was to increase his walking and non-vigorous activities as tolerated to full, non-vigorous use.

Plaintiff also reported to the doctor that he needed treatment of his bilateral knee arthritis and bilateral carpal tunnel syndrome. He had positive Tinel's and Phalen's signs with symptoms when sleeping, holding magazines and driving. There was no atrophy seen.

On July 26, 2004, Plaintiff completed a Personal Pain Questionnaire, stating that he had pain in both knees and both hands (R. 128). The pain was continuous. He used Motrin and Lorcet, which helped a little but also made him sick to his stomach, tired, and cranky. When his hand pain acted up he could not feel his fingers. Using his hands made it worse. He also stated that he woke up a lot at night due to his hands falling asleep, hurting and tingling, and his knees catching and hurting. He could read for about 30 minutes before his fingers went to sleep. He also stated that sometimes he failed to finish tasks because his hands fell asleep and his knees hurt too much. When he "hurt really bad" he had trouble concentrating, to a point where he could not even think. His hands fell asleep and he could not feel his fingers.

On September 22, 2004, Plaintiff was doing well with his ankle, with occasional soreness around his heel and up the Achilles. It was working well, and was non-tender. He walked easily, had rather good motion of the ankle and foot, and appeared to have recovered well from his ankle fracture and surgery.

Plaintiff also described numbness of the right fingers for years, especially at night or while driving. He had no radicular pain.

On August 11, 2004, State agency reviewing physician Thomas Lauderman, D.O. completed a Physical Residual Functional Capacity Assessment ("RFC"), opining that Plaintiff could lift 50 pounds occasionally, 25 pounds frequently, could stand/walk about 6 hours in an 8-hour workday,

and could sit about 6 hours in an 8-hour workday (R. 178). He was limited to occasional climbing of ladders, ropes, and scaffolds, and was otherwise limited to frequent posturals. He should avoid concentrated exposure to temperature extremes and hazards. He was otherwise not limited. Dr. Lauderman found that Plaintiff was credible and his pain and fatigue reduced his RFC.

An October 19, 2004, study indicated Plaintiff had bilateral carpal tunnel syndrome (R. 218).

On November 8, 2004, Plaintiff presented to Dr. Lefebure with complaints that his right knee had improved since his injection, but his left knee had been bothering him a lot (R. 198). It looked a little swollen with some crepitated motion, but had fairly good motion and no gross instability. X-rays showed moderate degenerative arthritis of both knees with narrowing of the lateral joint spaces and irregularity in all compartments of both knees. He still had some left ankle swelling, particularly when he had been on it for awhile. He had reasonably good flexion and his scar was well healed. Dr. Lefebure injected the left knee. Plaintiff asked for and received a prescription for a cane. He said he used it periodically, such as on long walks or outdoors, but not routinely. The doctor advised that they would try to continue to manage Plaintiff's knees conservatively, with joint replacement deferred as long as possible. He also advised Plaintiff again regarding good weight control to try and limit the stress on his knees, and advised against vigorous or hard activities.

On December 21, 2004, Dr. Hess diagnosed Plaintiff with bilateral knee pain due to osteoarthritis, chronic left ankle pain, and anxiety (R. 215). Plaintiff said the Klonopin was helping with his anxiety. Dr. Hess prescribed hydrocodone and Klonopin.

On December 23, 2004, State agency reviewing physician Fulvio Franyutti, M.D., completed an RFC of Plaintiff, opining that Plaintiff could lift 20 pounds occasionally, 10 pounds frequently, could stand/walk about 6 hours in an 8-hour workday, and could sit about 6 hours in an 8-hour workday (R. 185). He would be limited to occasional posturals. He should avoid concentrated

exposure to temperature extremes, vibration, and hazards. He had no other limitations. Dr. Franyutti concluded that Plaintiff's allegations were supported by findings that he was obese with severe osteoarthritis of the knees, worse on the left. He reduced plaintiff's RFC to light (R. 190).

On March 18, 2005, Plaintiff presented to Dr. Lefebure with complaints of heel pain and ankle and calf pain (R. 198). The heel and ankle appeared stable and not acutely tender. X-rays showed the lateral malleolus did not appear to have healed. The doctor could not understand this since he had been seeing Plaintiff regularly for his knees. He noted Plaintiff had moderate and fairly well advanced arthritis in both knees. He had had injections in both knees.

The doctor noted that Plaintiff walked reasonably well, with no acute pain or limping. The ankle seemed to have good motion and was fairly stable. He was to be careful with the ankle and avoid vigorous heavy use. He was prescribed Motrin for knee swelling.

On October 7, 2005, Dr. Hess diagnosed Plaintiff with severe osteoarthritis, low back pain, and agitation (R. 203). He continued to prescribe Lorcet, Aleve, and Klonopin.

On October 14, 2005, Plaintiff presented to Dr. Lefebure with "multiple complaints of different joint pains, his lower back, his hands, his elbows as well and his knees and his ankles." He took anti-inflammatories which provided some degree of relief. He said Dr. Hess would not address his back problem. He denied any previous investigation or treatment. His examination showed his hands and wrists with no significant synovial disease or swelling and reasonably good motion as did his elbows. He complained of some soreness in his spine to fairly light touch over the mid lumbar area. He could lean to the right and left, but with complaints of some pain. Both knees were not swollen or tender or hot. He walked slowly but independently. There were no obvious signs of inflammation. The doctor advised Plaintiff to consult with a rheumatologist.

That same day Dr. Hess wrote a letter stating that Plaintiff was unable to work until he had a Functional Capacity Evaluation, scheduled for October 25 (R. 202). His diagnosis was severe osteoarthritis.

On November 7, 2006, plaintiff saw rheumatologist Shelly Kafka for a consultation (R. 250). Plaintiff stated he was applying for disability because he was "no longer able to do his job as a construction worker."

Examination showed Plaintiff to be 5'7" tall and 270 pounds (R. 252). He had good strength in all extremities, his reflexes were normal, and he had no neurological deficits. There was tenderness in the cervical spine region with normal range of motion. He had normal range of motion of the thoracic spine. He had normal range of motion with exquisite tenderness over the lower lumbar spine region and exquisite tenderness over the right sacroiliac joint region. There was pain with rotation of the right shoulder, slight right elbow contracture, and slight tenderness to the touch on both wrists, with no synovitis. There was slight tenderness to the finger joints with no synovitis. His hips had fairly good range of motion. There was crepitus of both knees, with mild diffusion present, but range of motion was fairly normal. The left ankle was status post fracture with decreased range of motion and slight deformity. The right ankle had tenderness with range of motion although range of motion itself was normal.

The doctor diagnosed Plaintiff with "very significant osteoarthritis" of the knees given his young age (R. 253). She noted this condition was very unusual unless there was a genetic tendency or an underlying arthritis.

On November 15, 2005, physical therapist Maria Cipolla wrote to Dr. Hess that Plaintiff had missed his second FCE appointment (R. 227). His girlfriend rescheduled it the first time, but

9

Plaintiff did not appear on the rescheduled date and never called. ANA and rheumatoid blood tests were negative (R. 239).

On November 29, 2005, Plaintiff presented to rheumatologist Shelly Kafka, M.D. for evaluation of his diffuse osteoarthritis (R. 248). Upon physical examination, Plaintiff weighed 270 pounds and his blood pressure was 140/84. He had good range of motion in all joints with no synovitis. There was tenderness over the bilateral sacroiliac joint area and crepitance bilaterally. There was tenderness along the lateral joint margins and swelling in the left ankle with tenderness.

Ankle x-ray showed increased bone density over the dorsal proximal aspect with the possibility of an avulsion fracture. Hand x-rays were normal. Knee x-rays showed marked narrowing with marginal osteophytes and no erosions, not significantly changed from a year earlier. Sacroiliac x-rays were normal.

At the administrative hearing held on January 10, 2006, Plaintiff testified that he tested positive for bilateral carpal tunnel syndrome (R. 64). It caused his hands to got to sleep and hurt, so that he could not sleep at night, drive or talk on the phone. He also had problems with his shoulder, and sometimes it hurt just to lift a cup of coffee or put his shirt on. He did not sleep well because he had to move his arms and legs all the time.

When asked why he took Klonopin, Plaintiff testified that it was "for dealing with every day life with this stuff." He admitted he saw only his primary care physician for this condition.

Plaintiff's live-in girlfriend then testified that Plaintiff sometimes had problems putting on and tying his shoes (R. 69). He sometimes had trouble getting himself something to eat. He couldn't sleep through the night, and ended up sleeping through the day sometimes. She testified she could tell he was in a lot of pain and did not live a normal life. She testified that his hands swelled up, and

his knees, ankles, and shoulder bothered him a lot.  She testified that it was "a task for him to read a book."

Plaintiff's girlfriend testified that Plaintiff had side effects from his medications including nausea and drowsiness (R. 70).

## III.  Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920,  ALJ Moon made the following findings:

1.  The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through the date of this decision.

2.  The claimant had not engaged in substantial gainful activity since the alleged onset of disability.

3.  The claimant's diffuse osteoarthritis and obesity are considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(c) and 416.920(c).

4.  These medically determinable impairments did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.  The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6.  The claimant has the following residual functional capacity: he can perform a wide range of light physical exertional activities with the ability to lift/carry 10 pounds frequently and 20 pounds occasionally.  He can sit up to six hours in an 8-hour workday and after sitting one hour he should change position for a few minutes.  He can stand/walk six hours in an 8 hour workday limited to one-half an hour at a time.  The work must not expose the claimant to hazards such as unprotected height, dangerous and moving machinery or to hot and cold temperature extremes for an extended period of time.  He cannot use machinery with high emissions of vibrations.

7.  The claimant's past relevant work as telemarketer/fundraising did not require the performance of work-related activities precluded by his residual functional capacity ((20 CFR §§ 404.1565 and 416.965).

8.  The claimant's medically determinable diffuse osteoarthritis and obesity do not

prevent the claimant from performing his past relevant work.

9.   The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of the decision (20 CFR §§ 404.1520(f) and 416.920(f))

(R. 20).

## IV.  Discussion

### A.  Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### B.  Contentions of the Parties

Plaintiff contends:

1.   The ALJ's conclusion that Plaintiff can return to his past relevant work as a

telemarketer is not supported by substantial evidence; and

2.    This matter should be remanded to the commissioner for consideration of new and material evidence, pursuant to the sixth sentence of 42 U.S.C. § 405(g).

The Commissioner contends:

1.    The ALJ properly assessed Plaintiff's residual functional capacity in finding that he could perform his past relevant work as a fundraiser/telemarketer; and

2.    Plaintiff's newly submitted evidence does not support a remand of this case.

## C. Residual Functional Capacity

Plaintiff first argues that the ALJ's conclusion that he can return to his past relevant work as a telemarketer is not supported by substantial evidence. Plaintiff's argument is three-fold: 1) In determining his RFC, the ALJ did not consider all of Plaintiff's medically determinable physical impairments; 2) The ALJ did not address Plaintiff's and his girlfriend's testimony regarding Plaintiff's being tired and nauseous due to his pain medications; and 3) The ALJ did not properly evaluate Plaintiff's mental impairment. Defendant contends: 1) The ALJ took into account all of Plaintiff's impairments which resulted in functional limitations; 2) Plaintiff did not complain of any side effects from medication to any of his physicians; and 3) Aside from some mild anxiety which was relieved by Klonopin, there is no evidence that Plaintiff had any mental health problems.

## 1. Medically determinable impairments

Plaintiff argues that the ALJ gave significant weight to Dr. Kafka's reports, but did not include all the limitations Dr. Kafka noted in her treatment records. The ALJ found that Plaintiff had diffuse osteoarthritis, primarily bilateral knees, and obesity. He found these impairments were severe. Plaintiff argues that Dr. Kafka found he had pain in joints other than the knees, including

pain on rotation of the right shoulder, exquisite tenderness over the lower lumbar spine and right SI joint, and sensitivity or pain in the hands and feet. Plaintiff argues that, at the minimum, the ALJ should have included limitations in reaching with the right arm or bending at the waist, and use of the hands, "a critical function for a telemarketer."

The undersigned notes that there were no consultative examinations, and the two state agency physician RFC's were from August 2004 and December 2004, respectively (although the ALJ mistakenly refers to the second RFC as having been completed in December 2005). The first was based on a primary diagnosis of osteoarthritis with no secondary diagnosis, and the second was based on a primary diagnosis of osteoarthritis of the knees and a secondary diagnosis of obesity. Neither considered or mentioned Plaintiff's diagnosis of bilateral carpal tunnel syndrome. It is undisputable that Plaintiff has a medically determinable impairment of bilateral carpal tunnel syndrome confirmed by testing. A nerve conduction study in October 2004, confirmed carpal tunnel syndrome that was "prominent on both sides, but right more than left." When Plaintiff filled out his Personal Pain Questionnaire in July 2004, he expressly described hand pain with numbness and tingling, that kept him awake at night and caused him to be unable to hold a book or talk on the telephone for long.

As ALJ Moon himself stated: "The Regulations require that if a 'severe' impairment exists, all medically determinable impairments must be considered in the remaining steps of the sequential analysis" (20 CFR §§ 404.1523 and 416.923).

ALJ Moon accorded rheumatologist Kafka "significant" weight. Dr. Kafka found that Plaintiff had tenderness of the cervical spine, exquisite tenderness of the SI joint, slight elbow contracture, slight tenderness of the wrists, slight tenderness of the finger joints, and right ankle tenderness.

14

A review of the evidence shows that Plaintiff had a medically determinable hand, wrist, and finger impairment. This does not mean that the impairment was severe, but it does mean that it had to be considered throughout the decision. The undersigned finds the ALJ did not consider the effects of Plaintiff's medically-determinable bilateral carpal tunnel syndrome throughout his decision. Despite the doctors' findings regarding Plaintiff's arms, hands, wrists, and fingers, the ALJ did not ask any questions regarding possible limitations on use of hands and arms. Further, neither of the state reviewing physicians considered any arm or hand impairments, including Plaintiff's medically-determined bilateral carpal tunnel syndrome.

The undersigned therefore finds the ALJ did not take into consideration all of Plaintiff's medically determinable impairments, in particular his arm and hand impairments, and that substantial evidence does not support his RFC.

## 2. Side effects of medication

Plaintiff next argues that the ALJ did not address Plaintiff's and his girlfriend's testimony regarding his being tired and nauseous due to his pain medications. SSR 96-7 provides as follows, in pertinent part:

> 20 CFR 404.1529(c) and 416.929(c) describe the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements:
>
> 1. The individual's daily activities;
> 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
> 3. Factors that precipitate and aggravate the symptoms;
> 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
> 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
> 6. Any measures other than treatment the individual uses or has used to

15

relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7.      Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

Here, the undersigned finds the ALJ considered some, but not all the available evidence. In particular, the ALJ did not discuss the type, dosage, effectiveness and side effects of Plaintiff's medication, and did not discuss the treatment, other than medication, Plaintiff had received for relief of pain.  Plaintiff complained about side effects from his medications, including nausea and drowsiness, as far back as  his Personal Pain Questionnaire submitted on July 26, 2004.  He continued to report nausea and drowsiness as side effects of his medications on his Request for Reconsideration and Appeal of his Initial Denial.

Plaintiff testified during the administrative hearing that his medications caused him to be tired and sleepy, and that that side effect, in turn, was one of the main reasons for the decline in his job performance at his telemarketing job that led to his termination  Additionally, Plaintiff's live-in girlfriend also testified that Plaintiff's medications made him nauseous and very drowsy.  The ALJ, however, did not discuss her corroborating testimony.

The ALJ did not reject the alleged side effects; he did not discuss them at all.   The undersigned therefore finds the ALJ did not consider 'all the available evidence" in making his credibility determination.  The undersigned therefore finds substantial evidence does not support the ALJ's credibility determination or his RFC.

## 3.  Mental Impairments

Plaintiff also argues that the ALJ did not properly evaluate his mental impairment. Defendant contends: "Aside from some mild anxiety which was relieved by Klonopin, there is no evidence that Plaintiff had any mental health problems."  The ALJ noted that Plaintiff's treating

physician's reports "showed that in addition to his knee problems, the claimant had some symptoms of anxiety and depression and was given a trial of Effexor which was switched to Wellbutrin, and then Klonipin [sic] . . . . At a July 8, 2004 treatment visit . . . . he appeared stable after responding well to Klonipin and had a normal affect and normal thought process . . . . On the December 21, 2004 visit . . . .[h]e reported Klonipin [sic] as helping with his anxiety and there was no mention of any other mental health symptoms." The ALJ later found: "Aside from a brief mention of anxiety controlled by Klonopin, by the claimant's primary care physician (PCP) Dr. Hess, there was no evidence that the claimant's anxiety is a significant mental health impairment."

On March 16, 2004, Plaintiff's treating physician, Dr. Hess, noted Plaintiff's affect was markedly decreased and diagnosed depression. On April 6, Dr. Hess noted that Plaintiff had "some agitation symptoms on physical examination with regards to his psychiatric well-being." He diagnosed depression and anxiety. Dr. Hess was still prescribing Klonopin for Plaintiff at the time of the administrative hearing. The ALJ did not dispute Dr. Hess's diagnosis of anxiety or depression, and did not find they were not medically-determinable impairments. Further, although Dr. Hess opined that Plaintiff's anxiety and depression were "stable" on Klonopin, that does not mean they were not medically-determinable impairments. They appear to be medically determinable impairments, at least for some amount of time, although they may be found non-severe and may not cause any functional limitations.

20 C.F.R. § 404.1520a provides:

(a) *General.* The steps outlined in 404.1520 apply to the evaluation of physical and mental impairments. In addition, when we evaluate the severity of mental impairments for adults . . ., we must follow a special technique at each level in the administrative review process. We describe this special technique in paragraphs (b) though (e) of this section. Using the technique helps us:

(1)     Identify the need for additional evidence to determine impairment severity;

(2)     Consider and evaluate functional consequences of the mental disorder(s) relevant to your ability to work; and

(3)     Organize and present our findings in a clear, concise, and consistent manner.

(b)     *Use of the technique.*

(1)     Under the special technique, we must first evaluate your pertinent symptoms, signs, and laboratory findings to determine whether you have a medically determinable mental impairment(s). . . . If we determine that you have a medically determinable mental impairment(s), we must specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s) and document our findings in accordance with paragraph (e) of this section.

(2)     We must then rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c) of this section and record our findings as set out in paragraph (e) of this section.

(c)     *Rating the degree of functional limitation.*

(1)     Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment.

(2)     We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H

of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3)     We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listing of Impairments.

(4)     When we rate the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

(d)     *Use of the technique to evaluate mental impairments.* After we rate the degree of functional limitation resulting from your impairment(s), we will determine the severity of your mental impairment(s).

(1)     If we rate the degree of your limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities (see §404.1521).

(2)     If your mental impairment(s) is severe, we will then determine if it meets or is equivalent in severity to a listed mental disorder. We do this by comparing the medical findings about your impairment(s) and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder. We will record the presence or absence of the criteria and the rating of the degree of functional limitation on a standard document at the initial and reconsideration levels of the administrative review process, or in the decision at the administrative law judge hearing and Appeals Council levels (in cases in which the Appeals Council issues a decision). See paragraph (e) of this section.

(3)     If we find that you have a severe mental impairment(s) that

neither meets nor is equivalent in severity to any listing, we will then assess your residual functional capacity.

(e) *Documenting application of the technique.* At the initial and reconsideration levels of the administrative review process, we will complete a standard document to record how we applied the technique. At the administrative law judge hearing and Appeals Council levels (in cases in which the Appeals Council issues a decision), we will document application of the technique in the decision.

(1) At the initial and reconsideration levels, except in cases in which a disability hearing officer makes the reconsideration determination, our medical or psychological consultant has overall responsibility for assessing medical severity. The disability examiner, a member of the adjudicative team (see §404.1615), may assist in preparing the standard document. However, our medical or psychological consultant must review and sign the document to attest that it is complete and that he or she is responsible for its content, including the findings of fact and any discussion of supporting evidence. When a disability hearing officer makes a reconsideration determination, the determination must document application of the technique, incorporating the disability hearing officer's pertinent findings and conclusions based on this technique.

(2) At the administrative law judge hearing and Appeals Council levels, the written decision issued by the administrative law judge or Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

(3) If the administrative law judge requires the services of a medical expert to assist in applying the technique but such services are unavailable, the administrative law judge may return the case to the State agency or the appropriate Federal component, using the rules in §404.941, for completion of the standard document. If, after reviewing the case file and completing the standard document, the State agency or Federal component concludes that a determination favorable to you is warranted, it will process the case using the rules

20

found in §404.941(d) or (e). If, after reviewing the case file and completing the standard document, the State agency or Federal component concludes that a determination favorable to you is not warranted, it will send the completed standard document and the case to the administrative law judge for further proceedings and a decision.

(Emphasis added). The undersigned finds this technique was not followed at the Initial, Reconsideration, ALJ or Appeals Council level. The undersigned therefore finds this matter should be remanded for consideration, pursuant to 404.1520a, of Plaintiff's mental impairments.

Further, as the ALJ apparently found Plaintiff's anxiety/depression to be medically-determinable impairments, they should have been considered throughout the decision, notwithstanding that they may not be determined to be "severe." "The Regulations require that if a 'severe' impairment exists, all medically determinable impairments must be considered in the remaining steps of the sequential analysis" (20 CFR §§ 403.1523 and 416.923).

For all the above reasons, the undersigned finds substantial evidence does not support the ALJ's RFC or his credibility determination or his ultimate conclusion that Plaintiff was not disabled at any time through the date of his decision.

### D. New Evidence to the Court

Plaintiff lastly argues that this matter should be remanded to the Commissioner for consideration of new and material evidence, pursuant to the sixth sentence of 42 U.S.C. § 405(g). Plaintiff attaches to his motion a May 26, 2006, letter from Marc A. Valley, M.D., noting Plaintiff had been referred by Dr. Kafka because of his severe osteoarthritis. Dr. Valley noted Plaintiff's recent MRI showed severe degenerative disc disease, bone spurring, and neural foraminal narrowing of the lumbar spine, which he opined were consistent with Plaintiff's low back pain and

sciatica.

Defendant contends the evidence is neither new nor material, and that there was not good cause for Plaintiff's failure to submit the evidence prior to the ALJ's decision.

Because the undersigned finds this matter should be remanded to the Commissioner for other reasons, as noted above, he does not reach the merits of this argument. Upon remand, both parties shall be permitted to submit new evidence that is pertinent to the relevant time frame.

## V. RECOMMENDATION

For the reasons herein stated, I find substantial evidence does not support the Commissioner's decision denying the Plaintiff's applications for DIB and SSI. I accordingly recommend Defendant's Motion for Summary Judgment [Docket Entry 16] be DENIED and Plaintiff's Motion for Summary Judgment or, in the Alternative, for Remand Pursuant to the Sixth Sentence of 42 U.S.C. § 405(g) [Docket Entry 14], be GRANTED IN PART, by reversing the Commissioner's decision under sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Commissioner for further proceedings consistent and in accord with this Recommendation.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th

Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985);

Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this **23** day of *May*, 2007.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE